UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

THOMAS S. KENNEDY, III,

                Plaintiff,

vs.                                  CASE NO. 3:05cv220-RS

TRUSTMARK NATIONAL BANK,
FISHER BROWN, INC.,
GILBERT O. BENNETT,
ALAN D. MOORE,
BRADEN KIRK BALL, AND
ROBERT S. DAVIS,

                Defendants.
_____/

## ORDER ON MOTION TO DISMISS AMENDED COMPLAINT
## AND FOR SUMMARY JUDGMENT

      Before the Court is the Defendants' Motion to Dismiss Plaintiff's Amended Complaint
(Doc. 31.)

## I.  FACTS

      Plaintiff was employed for approximately twenty-seven years by Defendant
Fisher-Brown, Inc. ("Fisher-Brown"), an insurance company.  At some point during his
employment, Plaintiff advanced to the position of vice president.  As part of his
compensation, Plaintiff received shares of the common stock of Fisher-Brown.  Plaintiff
also entered into a stock purchase agreement with Fisher-Brown which required that
Plaintiff sell and Fisher-Brown purchase all of Plaintiff's Fisher-Brown stock in the event
that Plaintiff ceased to be employed by Fisher-Brown for any reason.  The price to be
paid for each share was its "fair market value."

      After Plaintiff was named a defendant in a criminal case, Fisher-Brown
terminated Plaintiff's employment on January 15, 2004.  At the time of his termination,

Plaintiff owned three hundred shares of Fisher-Brown stock.  Pursuant to the stock purchase agreement, Plaintiff sold and Fisher-Brown purchased the three hundred shares of stock.  The purchase price was approximately $1,500.00 per share.  In November, 2004, or approximately ten months after Plaintiff was terminated from Fisher-Brown, Trustmark National Bank ("Trustmark") purchased all of Fisher-Brown's stock for approximately $4,000.00 per share.

All counts in the initial Complaint (Doc. 1) were dismissed on January 17, 2006 (Doc. 21), for failure to state a claim upon which relief can be granted, lack of jurisdiction, or failure to meet the heightened pleading requirements of a claim based on securities fraud.  Plaintiff filed an Amended Complaint (Doc. 28) on February 17, 2006. The Amended Complaint asserts eleven causes of action against Defendants Fisher-Brown and four individually named officers, directors, and shareholders of Fisher-Brown.[1]  Essentially, Plaintiff contends that he was paid book value (allegedly $1,500.00 per share) rather than fair market value (allegedly $4,000.00 per share) in violation of the stock purchase agreement.  The crux of Plaintiff's Amended Complaint, however, is not grounded in a simple breach of the stock purchase agreement (although breach of contract is asserted as one cause of action); rather, Plaintiff's central contention is that Defendants "conspired" in a "fraudulent scheme" to "cheat" him out of $750,000.00 (the difference between the value of the shares at the forced buy-out price and the Trustmark transaction price) by paying him "book value" rather than "fair market value" for the stock and by failing to inform the appraiser of the stock that the sale to Trustmark was imminent.

Federal jurisdiction is based on the federal question alleged in the first cause of action.  In the first cause of action, Plaintiff alleges a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  The remaining causes of action (two through

---

[1]The original Complaint (Doc. 1) also named Trustmark as a Defendant. Trustmark is not named a Defendant in the Amended Complaint.

eleven) are based on Florida state law or seek declaratory relief under the Federal Declaratory Judgment Act.[2]  Plaintiff seeks compensatory and punitive damages.

On March 31, 2006, Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint (Doc. 31) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Attached to the Memorandum in Support of Motion to Dismiss Plaintiff's Amended Complaint (Doc. 32) were various exhibits, including (1) Fisher-Brown, Incorporated Stock Purchase Agreement; (2) Fisher-Brown, Incorporated Amended and Restated Stock Purchase Agreement; and (3) an appraisal of the value of Fisher-Brown stock which Defendants claim supports their contention that Plaintiff was paid the fair market value for his stock upon termination.

On July 3, 2006, this Court notified the parties of its intent to convert Defendants' Motion to Dismiss Plaintiff's Amended Complaint into a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(b) (Doc. 41.)  In accordance with Federal Rule of Civil Procedure 56(c), Defendants and Plaintiff were granted an appropriate amount of time to file any documents in support of or in opposition to the converted motion.  Because Plaintiff asserted that the exhibits attached to the Memorandum in Support of Motion to Dismiss Plaintiff's Amended Complaint were not properly authenticated, this Court ordered that all documents offered in support of or in opposition to the converted motion for summary judgment be properly authenticated (Doc. 41).  On July 14, 2006, Defendants filed affidavits in support of the converted motion for summary judgment (Doc. 43.)  On August 1, 2006, Plaintiff filed affidavits in opposition to the converted motion for summary judgment (Doc. 46).

---

[2]The remaining causes of action include (1) violation of Florida Securities and Investor Protection Act, Fla. Stat. § 517.301 et seq.; (2) negligent and grossly negligent misrepresentations; common law fraud; (3) intentional misrepresentations; common law fraud; (4) negligence; (5) an ambiguous claim alleging that defendants took advantage of Plaintiff's "emotional and economic duress to perpetrate the wrongdoing"; (6) breach of good faith and fair dealing; (7) detrimental reliance; (8) breach of contract; (9) declaratory judgment; and (10) constructive trust.

## II.  DISCUSSION

**A. The Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)).  "An issue of fact is 'material' if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)).  "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Tipton, 965 F.2d at 998 (citing Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251, 106 S. Ct. at 2512.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993); Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).  Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir.1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985)).  However, "[a]

mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, 477 U.S. at 251, 106 S. Ct. at 2511).

If the movant satisfies its initial burden under Rule 56(c) by demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole."  Tipton, 965 F.2d at 998 (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255, 106 S. Ct. at 2513 (citing Adickes, 398 U.S. at 158-59, 90 S. Ct. at 1609).  In light of the summary judgment standard, this Court will apply the relevant substantive law to the facts of the case.

## B.  The Substantive Law

Count One alleges a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  This Court need not venture into a sophisticated legal analysis of the merits of Plaintiff's claim under Rule 10b-5 because the factual allegations contained in the Amended Complaint are unsubstantiated.  Plaintiff alleges that he was paid "book value" rather than "fair market value" for his Fisher Brown stock upon termination. However, Plaintiff provides no evidence, other than his own conclusory and uncorroborated allegations, that he received the stock's "book value" rather than its "fair market value."  This Court expressed an identical observation when it dismissed the initial Complaint for failure to conform to the heightened pleading requirements necessary to allege securities fraud under Rule 10b-5.  This Court's Order dated

January 17, 2006, stated that "Plaintiff alleges that he was paid book value for the stock rather than fair market value.  However, Plaintiff fails to provide particular facts to support that assertion."  (Doc. 21:7.)  Now, seven months later, Plaintiff has still failed to substantiate his belief that the value he received for the stock was "book value."  Plaintiff submitted two documents in opposition to the converted motion for summary judgment: (1) an affidavit from Plaintiff and (2) an affidavit from Plaintiff's counsel.  Nothing in either of those documents, other than Plaintiff's own conclusory and uncorroborated allegations, substantiates Plaintiff's claim that he received "book value" for the stock.

In fact, Defendants *agree* that Plaintiff was entitled to receive the fair market value for his stock upon his termination.  That issue is therefore not even disputed by the parties.  Paragraph 6 of the Fisher-Brown, Inc. Amended Restated Stock Purchase Agreement ("Agreement"), relied on and signed by both Plaintiff and Defendants, unambiguously states, in relevant part, that

> [w]ith respect to . . . the mandatory purchase and sale under Section 5 of this Agreement, the purchase price . . . for each of the Shares held by the Employee shall be the <u>fair market value</u> of a share of stock of the Company as determined for purposes of the Company's [Employee Stock Ownership Plan] as of the 'applicable valuation date.'

(Doc. 32-3:5 ¶ 6) (Emphasis added.)  Thus, it is unequivocal that Plaintiff was entitled to receive the "fair market value of a share of stock of the Company as determined for purposes of the Company's Employee Stock Ownership Plan as of the applicable valuation date."  That much is certain.

The real issue therefore is whether any reasonable inference can be drawn that Plaintiff received something other than "the fair market value of a share of stock of the Company as determined for purposes of the Company's Employee Stock Ownership Plan as of the applicable valuation date" upon his termination.  The Agreement (Doc. 32-3), defines, in relevant part, the "applicable valuation date" as follows:

> At the option of the Company, the applicable valuation date shall be either (i) the normal (probably annual) valuation date

> under the ESOP . . . coinciding with or immediately preceding
> the termination of Employee's employment with the Company
> . . . or (ii) . . . the date on which the Employee ceases to be
> employed by the Company.

(Doc. 32-3:5 ¶ 6.)  Thus, the fair market value of Plaintiff's stock was required to be

determined based on its value on a date coinciding with, or preceding, the date of

Plaintiff's termination, or January 15, 2004.  The fair market value of Plaintiff's stock was

not required, or even permitted, to be determined ten months later when the sale to

Trustmark occurred.  Pursuant to the option granted to them under the Agreement,

Defendants selected option (i) as the "applicable valuation date."[3]

Defendants submitted an authenticated copy of the "Valuation Report of the

Common Stock of Fisher-Brown, Inc. as of December 31, 2003" ("Valuation Report").

December 31, 2003, was the normal, annual valuation date immediately preceding the

date in January 2004, on which Plaintiff was terminated.  The Valuation Report

determines the "fair market value of a share of stock of the Company as determined for

purposes of the Company's Employee Stock Ownership Plan."[4]  The appraisal was

---

[3]Plaintiff does not contend that Defendants were not entitled to choose the
applicable valuation date under option (i) or (ii).  Even if Fisher-Brown had selected the
later date contained in option (ii) as the applicable valuation date, Plaintiff provides no
evidence nor can it be inferred that the fair market value of his stock would have been
different from the fair market value of his stock on the normal, annual valuation date of
option (i) which was December 31, 2003, or just fifteen days prior to the date on which
Plaintiff was terminated.

[4]The Valuation Report itself states in its introductory paragraph that

> The Plan Committee of the Fisher-Brown, Inc. Employee Stock
> Ownership Plan has requested that we evaluate the common
> stock of Fisher-Brown, Inc. . . . in order to determine the fair
> market value of the common stock on a controlling interest
> basis in connection with common stock transactions involving
> the Company's Employee Stock Ownership Plan ("ESOP") for
> the plan year ended December 31, 2003.

(Doc. 32-4:6.)  Moreover, the affidavits from M.O. Weinress, the consultant who
performed the appraisal of Fisher-Brown stock, and Braden K. Ball, the senior vice

performed by M.O. Weinress, a corporate valuation consultant with Sansome Street
Appraisers, Inc.

   According to the Valuation Report and Weinress's affidavit, the controlling
interest fair market value of 100% of the equity of Fisher-Brown, for ESOP purposes,
was $20,923,000 or $1,516.16 per share.  (Docs. 32-4:8 & 43-8:3 ¶ 8.)  That is the
value that Plaintiff received for his stock upon its sale and purchase.  Plaintiff claims that
this value was the book value rather than the fair market value of the stock.  However,
not even a scintilla of evidence substantiates this claim.  The Valuation Report even
*addresses* Fisher-Brown's book value, stating that Fisher-Brown's book value as of
December 31, 2003, was $5,765,354.  See Doc. 32-4:17.  This equates to a book value
of $417.78 per share.[5]  Consistent with Plaintiff's understanding that the value of his
stock would not be based on book value, the Valuation Report specifically notes that

> Book value, per se, is typically not given much weight in the
> valuation of company [sic] such as Fisher-Brown unless, on a
> liquidation basis, it exceeds the value as calculated using
> methods related to the earning power of the Company.

(Doc. 32-4:17.)  The Valuation Report refused to give any weight to the book value in
determining the fair market value of a share of stock of Fisher-Brown because the book
value did not exceed the value of Fisher-Brown as calculated using methods related to
its earning power.  Consistent with this conclusion, Weinress stated in his affidavit that

> I gave no weight to this book value in determining the fair
> market value of the stock, because, as I stated on pages 12
> and 37 of the Valuation Report, the book value did not
> exceed 'the value as calculated using methods related to the
> earning power of the Company.'  As explained and detailed

---

president and chief operating officer of Fisher-Brown, confirm in their affidavits that the
fair market value listed in the Valuation Report was the "fair market value of a share of
stock of the Company as determined for purposes of the Company's Employee Stock
Ownership Plan."  See Docs. 43-2:2 ¶ 6 & 43-8:2-3 ¶¶ 5 & 9.

   [5]The per share book value was calculated by dividing the book value,
$5,765,354, by the total number of shares issued, or 13,800.

> at pages 3 and 37-51 of the Valuation Report, I instead
> based the valuation of the fair market value upon methods
> utilizing market comparable data - including 'Done Deals,' a
> service that provides transaction information for like
> companies - and the capitalization of the Company's earning
> capacity.

(Doc. 43-8:3 ¶ 8.)  Plaintiff contends that it was "common knowledge" as well as his own understanding based on presentations that were given by Defendants that the market value of Fisher-Brown stock was "two or three times 'book value.'" (Doc. 46-2:2 ¶ 8.) The facts presented by Defendants, however, are *consistent*  with Plaintiff's understanding: The fair market value determined by the Valuation Report ($1,516.16 per share) was 3.6 times greater than the book value ($417.78 per share).  That Plaintiff claims to have been unaware of the appraisal process, that he does not understand the terms "book value," "fair market value," and "fair market value for ESOP purposes," or that he assumed, albeit incorrectly, that "book value" meant "appraisal value" and "fair market value" meant the actual sales price to a third party, do not negate the fact that Plaintiff received what he was entitled to receive under the Agreement that he signed - the fair market value of his stock on the applicable valuation date.

Plaintiff questions, however, the accuracy of the Valuation Report.  He contends that upon his termination, Defendants failed to inform both himself and Weinress that the sale to Trustmark was "imminent."  Plaintiff asserts that had he known of the alleged negotiations between Fisher-Brown and Trustmark, he would have refused to accept the purchase price for his stock.  Plaintiff, however, had no choice in the matter. Plaintiff is not alleging wrongful termination.  Although Plaintiff states that it was "fortuitous" for Defendants that he was named a Defendant in a criminal case, he does not assert a separate count for wrongful termination against Defendants or claim that the decision to terminate him was unlawful.  Thus, upon his lawful termination, Plaintiff was required to sell, and Fisher-Brown was required to purchase, Plaintiff's stock

pursuant to Paragraph 5 of the Agreement.[6]  It should also be noted that although Fisher-Brown was required to purchase all of Plaintiff's stock within ninety days after the date on which Plaintiff was terminated, the purchase price for Plaintiff's stock would have remained the same even if Plaintiff had resisted the sale-purchase of his stock for the full ninety days after his termination.  This is true because the "applicable valuation date" would have remained December 31, 2003, pursuant to Paragraph 6(i) of the Agreement whether the sale-purchase occurred in January 2004, or whether it occurred in April 2004.  Thus, Plaintiff's knowledge of any alleged dealings between Fisher-Brown and Trustmark is irrelevant.

Plaintiff also claims that Defendants failed to inform Weinress of the "impending sale" to Trustmark.  Plaintiff contends that Weinress therefore failed to take such information into account when appraising the fair market value of Fisher-Brown stock.  Accordingly, Plaintiff maintains that the Valuation Report is inaccurate.  Plaintiff asserts that "the following fact issues preclude summary judgment: (vii) Was the appraisal done properly in light of the impending sale? (viii) Should the impending sale to Trustmark have been taken into account by the appraiser?  (vi) What impact, if any, would complete knowledge of the sale have had on the appraisal?"  (Doc. 46-1:4.) Plaintiff, however, provides no evidence that the sale to Trustmark was "impending" on December 31, 2003, the applicable valuation date.  Indeed, the sale to Trustmark did

---

[6]Paragraph 5 is entitled "Mandatory Sale Upon Termination of Employment" and states that

> (a) If Employee shall cease to be employed by Company, or by any subsidiary or successor corporation of Company, for any reason, including death, then Employee, or his personal representative shall sell all of his Stock to Company at the price and on the terms specified in this Agreement.
>
> (b) If Employee shall cease to be employed by Company or by any subsidiary or successor corporation of Company for any reason, including death, then Company shall purchase all of Employee's stock within ninety (90) days after the date on which Employee shall cease to be employed by Company, or any subsidiary or successor corporation of company.

not occur until approximately eleven months after December 31, 2003, or November 2004.  The Amended Complaint alleges that the relationship between Fisher-Brown and Trustmark consisted only of "meetings, conversations, discussions, and negotiations" in 2003.  (Doc. 28 ¶¶ 28, 29, 30, 38, 41, 42, 46, 54.)  A sale which occurs in November 2004, or ten months after "meetings, conversations, discussions, and negotiations" hardly appears to be "imminent" or "impending," at least on its face, on December 31, 2003.  Plaintiff provides no evidence, nor is any evidence apparent from the record, to support Plaintiff's contention that the sale to Trustmark was "impending" on December 31, 2003.

Plaintiff also provides no evidence that mere business meetings, discussions, conversations, or negotiations, without more, should influence the valuation of a company's stock.  Business dealings often fall through.  Whether a sale will result from such discussions and negotiations is speculative.  This is particularly true where, as here, Plaintiff contends that the discussions with Trustmark by the individual Defendants, who were all minority shareholders, were held in secret.  (Doc. 28:7 ¶ 38.) The majority of the shares in Fisher Brown stock were owned by the one-hundred plus employees of Fisher Brown, including Donald Rushing, the founder of the company who owned 21.73% of the stock and who is not a Defendant in this case.  (Doc. 28:7 ¶¶ 35, 37.)  Any sale of Fisher-Brown to Trustmark would presumably have required the approval of the majority shareholders before it could have occurred.  How Plaintiff can maintain that the sale to Trustmark was "imminent" in 2003 while at the same time alleging that Defendants concealed the sale from the majority shareholders, the same shareholders who would be required to approve the sale, is beyond comprehension.

Furthermore, Plaintiff's contention that Defendants failed to inform Weinress of the conversations between Fisher-Brown and Trustmark lacks support.  In fact, Weinress specifically refuted this assertion when he stated in his affidavit that Defendants *did* inform him of the ongoing "conversations" and "discussions" between Fisher-Brown and Trustmark when preparing his Valuation Report.  Weinress stated in his affidavit that

> Upon my receipt in April, 2004 of the year-end financial statements of Fisher-Brown, Incorporated for my use in the valuation of the stock, I was made aware by the Plan Committee of the ESOP that during fiscal year 2003, management of Fisher-Brown, Incorporated had entered into some conversations with a potential buyer, Trustmark National Bank; however, as of the ESOP year end (December 31, 2003) and as of the date of my submission of the Valuation Report, those discussions were ongoing, there was no letter of intent for any purchase, no terms had been finalized, and the transaction was far from being certain or settled. Under these circumstances, it would have been inappropriate and pointless to utilize, reference, or give credence to such uncertain, imprecise information and unsettled activities in 2004 for determining the controlling interest value of the company for ESOP purposes when it was to be valued as of December 31, 2003. Even if there had been firm or finalized terms of the sale in 2004 prior to my issuance of the Valuation Report, this subsequent information would not have been used in making a 2003 year-end valuation determination.

(Doc. 43-8:3-4 ¶ 10.)  No evidence exists in the record to refute Weinress's statements.

In essence, Plaintiff's assertions are unsubstantiated allegations that were obviously made before reasonable inquiry. Plaintiff himself admits in his affidavit that "I had never actually seen an appraisal of Fisher-Brown stock until one was presented as an exhibit in this litigation. I had no knowledge of the appraisal process . . ." (Doc. 46-3:2 ¶ 8.) Despite his lack of knowledge, Plaintiff somehow manages to base the allegations in his Amended Complaint on "information and belief." What basis, if any, exists for Plaintiff's "information and belief" has not been made apparent to this Court.

Plaintiff's counsel submitted an affidavit in which he contends that summary judgment is inappropriate because Defendants have refused Plaintiff's requests for discovery, including Plaintiff's requests to depose Weinress and Ball. This contention is without merit. The discovery deadline set forth in this Court's Scheduling and Mediation Order dated March 30, 2006 (Doc. 30) was July 21, 2006. That deadline has expired. In addition, Plaintiff was placed on notice of the Valuation Report when it was attached as an exhibit to Defendant's Motion to Dismiss Amended Complaint on March 31, 2006. This Court notified both parties of its intent to convert Defendant's Motion to Dismiss

Amended Complaint into a motion for summary judgment in the Order dated July 3, 2006 (Doc. 41). In that Order, Defendants were given until July 14, 2006, to submit any evidence that they wished this Court to consider in ruling on the converted motion for summary judgment.  Plaintiff was given until July 29, 2006, or approximately one month after he was allegedly placed on notice of the Valuation Report, to submit any evidence in opposition to the converted motion for summary judgment.  Despite his notice of the Valuation Report, this Court's order converting the motion to dismiss into one for summary judgment, a one-month period in which to muster evidence, and the possibility that Plaintiff's case could be dismissed for lack of evidentiary support, the only evidence offered by Plaintiff to withstand the converted motion for summary judgment were two affidavits, one from himself and the other from his counsel.  Neither creates a genuine issue of material fact.  Plaintiff was aware of Weinress's affidavit when it was filed on July 14, 2006.  Plaintiff then had more than two weeks in which to depose Weinress or Ball, submit an affidavit from another appraiser to create a genuine issue of material fact, request an extension of time in which to depose Weinress or Ball, or file a motion to compel discovery.  Plaintiff, however, undertook to complete neither of these tasks. Now, at the eleventh hour, Plaintiff attempts to withstand summary judgment based on the untenable argument that he has been denied discovery.  That contention, especially when considered in conjunction with Plaintiff's unsubstantiated allegations, is unjustified. The heightened pleading requirements of the Private Securities Litigation Reform Act were instituted to

> curtail the abusive actions of plaintiffs in securities litigation who bring meritless claims hoping to initiate discovery and uncover evidence that was not alleged in the complaint.  The Act seeks to dispose of these types of claims before a defendant is forced to engage in expensive and protracted discovery.

 Smith v. Smith, 184 F.R.D. 420, 422 (S.D. Fla. 1998).

　　　　Finally, Plaintiff contends that the statements in Weinress's affidavits are in the nature of expert opinion although Weinress has never been designated as an expert

witness.  This contention is also without merit.  Plaintiff alleges securities fraud.  Thus, even if Weinress erred in his opinion that discussions, conversations, or finalized agreements to sell Fisher-Brown to Trustmark were irrelevant for purposes of valuing Fisher-Brown stock on the applicable valuation date because he is not an "expert," such error does not show that Defendants or Weinress (who is not a named Defendant) committed securities fraud.  In order to allege securities fraud under Rule 10b-5, a plaintiff must show: 1) a misstatement or omission; 2) of a material fact; 3) made with scienter;  4) on which Plaintiff relied; 5) that proximately caused his injury.  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1281 (11th Cir. 1989) (citing Ross v. Bank South, N.A., 885 f.2d 723, 728 (11th Cir. 1989) (en banc)).  The United States Supreme Court has defined "scienter" as a "mental state embracing intent to deceive, manipulate, or defraud."  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12, 96 S. Ct. 1375, 1381, 47 L. Ed. 2d 668, 677 (1976).  The Eleventh Circuit has defined "scienter" as a mental state characterized by "severe recklessness."  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir. 1989). Where, as here, Defendants inform rather than conceal from the appraiser facts that are possibly relevant to a stock's valuation, specifically, the ongoing communications that were occurring between Fisher-Brown and Trustmark, it appears highly unlikely that Defendants could possess the requisite scienter necessary for securities fraud.  Plaintiff does not allege that Weinress himself possessed such a mental state when performing the appraisal of the stock.

Further, the Agreement limited the fair market value of Plaintiff's stock to the "fair market value . . . as determined for purposes of the Company's ESOP" only.  (Emphasis added.)  In other words, the fair market value was not required to be a universally accepted, objective appraisal to be performed by a court-identified expert.  Defendants selected Sansome Street Appraisers and Weinress to determine the fair market value of stock "for purposes of the Company's ESOP."  Plaintiff has submitted no evidence, nor can any inference reasonably be drawn from the record, that the appraisal of the "fair market value" of Plaintiff's stock "as determined for purposes of the Company's ESOP" was inaccurate.  Weinress stated in his affidavit that he is a graduate of both Princeton and Columbia Universities and holds a Masters degree in Business Administration.  He

has performed over eight hundred valuations of stock, including valuations of three insurance agencies or broker firms, such as Fisher-Brown.  No evidence is apparent from the record to contradict the accuracy of Weinress's appraisal.

### Summary

Plaintiff has failed to submit evidence from which a reasonable jury could find that he was a victim of securities fraud under Rule 10b-5 for the following reasons:

1.  Plaintiff and Defendants agree that Plaintiff was entitled to receive the fair market value of his Fisher-Brown stock on the applicable valuation date.

2.  The Valuation Report calculated both the book value and the fair market value of Plaintiff's stock on the applicable valuation date of December 31, 2003.

3.  Plaintiff was paid the fair market value of $1,516.16 per share as identified in the Valuation Report.  Plaintiff was not paid the book value that was identified in the Valuation Report.

4.  No evidence in the record provides any indication that the fair market value of $1,516.16 was an inaccurate figure.  The fair market value is more than three times the book value of the stock, consistent with Plaintiff's understanding.  The appraisal was completed by M.O. Weinress of Sansome Street Appraiser's, Inc.  Weinress stated in his affidavit that he has performed hundreds of such valuations throughout his career. The Valuation Report appears to be comprehensive and accurate.  Plaintiff has submitted no evidence to contradict the reasoning and conclusions contained within the Valuation Report.

5.  Plaintiff has produced no evidence that the sale of Fisher-Brown to Trustmark in November 2004, should have influenced the valuation eleven months earlier on December 31, 2003.  The appraiser stated in his affidavit that he was aware of the communications between Fisher-Brown and Trustmark; no evidence indicates that the sale was anything but speculative and uncertain to occur on the applicable valuation date; and majority shareholders who would be required to approve the sale were

unaware of the sale because it was allegedly concealed from them by Defendants, according to Plaintiff's own allegations.

## CONCLUSION

1.  Summary Judgment is granted in Defendants' favor on the First Cause of Action of the Amended Complaint (Doc. 28), which alleges a violation of Rule 10b-5.

2.  Summary judgment is granted in Defendants' favor on the Tenth Cause of Action of the Amended Complaint, which requests declaratory relief under the Federal Declaratory Judgment Act and is derivative of the First Cause of Action.

3.  The clerk shall enter judgment dismissing the First and Tenth Causes of Action with prejudice.

4.  The Court lacks subject matter jurisdiction to decide all remaining causes of action, which are based on Florida law.  Accordingly, all remaining causes of action (Two, Three, Four, Five, Six, Seven, Eight, Nine, and Eleven) are dismissed without prejudice.

5.  The clerk shall close the file.


        **ORDERED** on August 22, 2006.


                                **/s/ Richard Smoak**
                                **Richard Smoak**
                                **United States District Judge**